UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| LETITIA MICHELE YEAGER, <br><br> Plaintiff, <br><br> v. <br><br> KOHLER CO., <br><br> Defendant. | Case No. 22-CV-65-JPS <br><br><br> **ORDER** |

**1.  INTRODUCTION**

On February 18, 2022, Plaintiff Letitia Michele Yeager ("Plaintiff") filed a pro se amended complaint alleging that her former employer, Defendant Kohler Co. ("Defendant") terminated her employment in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII"), as codified, 42 U.S.C. §§ 2000e–17, and the Americans with Disabilities Act of 1990 ("ADA"), as codified, 42 U.S.C. §§ 12112–12117. ECF No. 8 at 2. On July 5, 2022, Defendant moved to dismiss the amended complaint. ECF No. 19. On November 28, 2022, the Court granted in part and denied in part the motion to dismiss, concluding that Plaintiff's disability-related claims, including those brought under the ADA, were subject to dismissal for failure to exhaust administrative remedies. ECF No. 24 at 5.

Now before the Court is Defendant's motion for summary judgment, ECF No. 31, which Plaintiff did not oppose. For the reasons discussed herein, the Court will grant the motion.

## 2. FACTUAL BACKGROUND[1]

### 2.1 Plaintiff's Role at Defendant Company

Defendant is a manufacturing company. Defendant manufactures (among other plumbing products) sink faucets for kitchens and bathrooms.

Plaintiff, an African-American woman,[2] began her employment with Defendant on or about September 2, 2014 as an assemble to order operator ("ATOO"). During her employment with Defendant, Plaintiff was represented by United Auto Workers Local 833.

In 2021, Plaintiff worked in Value Stream 50. In this value stream, she built sink faucets. As an ATOO, Plaintiff's primary duty was to manufacture faucets as part of the overall manufacturing process. In this role, her direct supervisor was Production Supervisor Thomas Hameister ("Hameister"). Hameister's supervisor was Manager of Operations, Katherine Stoeger ("Stoeger").

Those working in Value Stream 50 worked near those in Value Streams 51 and 53. Value Stream 51, however, assembled tub faucets and packaging washers, while Value Stream 53 assembled small parts for kitchen faucets, such as nuts and bolts.

---

[1] The following recitation of facts is drawn from the parties' agreed upon statement of facts, ECF No. 32, with minor, non-substantive edits. The parties additionally submitted a joint statement enumerating their respective disputed facts. ECF No. 33. Although she did not submit any brief in opposition to the motion for summary judgment, Plaintiff signed both statements. ECF No. 32 at 13; ECF No. 33 at 4.

[2] The parties' statement of undisputed facts does not provide Plaintiff's race. The amended complaint, however, refers to Plaintiff as the "only African-American" in her department. ECF No. 8 at 4.

### 2.2 Defendant's Employment Policies

During the period of Plaintiff's employment, Defendant maintained both a Fair Employment Practices policy and an Equality in Employment Practices policy, both of which applied to all employees, both union and non-union. Plaintiff received an employment policy handbook during her employment.

Under Defendant's attendance policy in effect in 2021, attendance points followed a rolling, 12-month calendar year. Non-probationary employees received a verbal warning when they reached 8 points and were discharged upon reaching 12 points.

### 2.3 Defendant's Assembly and Auditing Process

Defendant's manufacturing process relies on a Bill of Material ("BOM") to assemble faucets. The BOM outlines the process for assembling one of Defendant's products.

Defendant expects that all products built have no residue leftover from an operator and that the products are clean. Defendant uses an auditing software to audit the quality of its products. When a finished product is ready to go to the warehouse, its bar or QR code is scanned and "the system determines whether the product is due for an audit." During an audit, five pieces are selected off of a lot or pallet. If any of these five pieces fails the audit, the next lot will be automatically audited. The system will continue to automatically audit every subsequent lot until one passes without failures. Whether there is any human influence on which and how many lots are audited is disputed.[3]

---

[3] Although the parties' joint statement of undisputed facts provides that "[t]here is no human influence on which and how many lots are audited," ECF No. 32 at 4, Plaintiff's statement of disputed facts provides, without citation to any

### 2.4 Initial Performance and Attendance Problems

On January 15, 2021, Defendant issued Plaintiff a verbal warning for attendance violations. Plaintiff had "no reason to believe" that she was not absent on the dates for which she was disciplined.

On May 1, 2021, Defendant issued Plaintiff a verbal warning for "high losses/poor quality or performance." This discipline stated that five faucets Plaintiff had manufactured failed an audit for cleanliness, two failed for gaps between the handle and escutcheons, and three failed for handle misalignment. Plaintiff disputed the issuance of the discipline, but she does not dispute that the audit failures occurred.

On June 1, 2021, Defendant issued Plaintiff a first written warning for attendance violations. On June 22, 2021, Defendant issued Plaintiff another written warning for attendance violations.

On July 29, 2021, five of Plaintiff's faucets were audited, and all five failed. The following day, July 30, 2021, fourteen of Plaintiff's faucets were audited, and four failed.

On August 4, 2021, Defendant issued Plaintiff a first written warning for "high losses/poor quality or performance." Plaintiff confirmed that all of the quality issues listed in support of this discipline "did occur to these faucets."

On August 26, 2021, Defendant issued Plaintiff a written warning for attendance violations. Plaintiff confirmed the basis for the discipline was accurate, and she did not dispute the discipline.

---

evidentiary support, that "[t]here was definitely a human influence on which products were audited." ECF No. 33.

Page 4 of 15
Case 2:22-cv-00065-JPS   Filed 05/31/23   Page 4 of 15   Document 42

In July and August of 2021, the Wisconsin Faucets division "noticed an uptick in quality issues" caused by employees failing to follow proper BOM procedures.

**2.5     The Stool Issue**

On August 26, 2021, Plaintiff asked a "material handler" to bring her a stool. She started sitting on it while working. She did not ask permission to do so.

Hameister told Yeager she could not sit on the stool while working. Similarly, Stoeger told Yeager that sitting was not allowed and that Plaintiff needed to speak with Human Resources ("HR") if she believed she needed to sit while working.

As a general matter, Defendant does not allow employees to use stools while working. The only value stream in which stools are permitted while working is Value Stream 53. That value stream is allowed the use of stools, while others are not, because of the need in Value Stream 53 to look at a part from a certain angle. Plaintiff never worked on Value Stream 53, and she testified that she never saw anyone in her own value stream—Value Stream 50—sitting on a stool while working. Defendant had previously completed an ergonomic assessment on Plaintiff's position and determined that "sitting would cause too much compression on the spine" as compared to standing.

When Plaintiff arrived to work on August 27, 2021, the stool was not at her station. Plaintiff complained to HR Generalist Nicole Pecore ("Pecore"). Pecore conducted an investigation into the missing stool. The investigation was unable to determine where the stool went. Pecore told Plaintiff that a stool would not be allowed unless a new ergonomic

assessment was done or if Plaintiff provided a doctor's note indicating she needed to sit while working.

On September 1, 2021, Plaintiff emailed Pecore stating that she believed she was ridiculed and scrutinized because of her race. Pecore responded that Defendant did not issue discipline for sitting on a stool and encouraged Plaintiff to report any violation of the anti-discrimination policies. Plaintiff did not do so.

Several days later, Plaintiff received a doctor's note allowing her to sit while working. She made no further complaints relating to the stool issue.

**2.6    Continued Performance and Attendance Problems**

On September 1, 2021, Defendant issued Plaintiff a verbal warning for respectful workplace violations. Pecore conducted an investigation into Plaintiff's behavior and determined that Plaintiff had "acted inappropriately" during a tier meeting. The discipline was supported by statements from eight witnesses.

On September 2, 2021, Defendant issued Plaintiff another written warning for attendance violations. Plaintiff confirmed that the basis for the discipline was accurate, and she did not dispute the discipline.

On October 11, 2021, Defendant issued Plaintiff another written warning for "attendance points accrued on October 20, 2020; December 14, 2020; January 13, 2021; February 1, 2021; May 26, 2021; June 18, 2021; August 18, 2021; August 23, 2021; August 28, 2021; and September 30, 2021." Plaintiff confirmed she received the number of attendance points supporting this discipline.

Also on October 11, 2021, Defendant issued Plaintiff a third and final written warning for attendance violations. "In addition to the dates in the

October 11, 2021 . . . written warning, she accrued attendance points for COVID-19 related absences" from September 21, 2021 through September 24, 2021; September 27, 2021 through September 30, 2021; October 1, 2021; and October 4, 2021 through October 7, 2021. Plaintiff confirmed that she received these attendance points.

On October 26, 2021, Defendant issued Plaintiff a second written warning for "high losses/poor quality or performance." The basis for this discipline was that "some of the faucets she built were missing a flow restrictor . . . ." Plaintiff did not dispute this.

On November 10, 2021, Defendant issued Plaintiff a third and final written warning for "high losses/poor quality or performance." The basis for this discipline was that of five inspected items, two were missing labels, one had damage to the spout, one was missing finish on the spout, and one had excessive product on it. The missing label, specifically, constituted a violation of the BOM procedures. Hameister, Stoeger, and Pecore told Plaintiff "that any BOM failures would push her to another step in the disciplinary process."[4] At the time of this discipline, Plaintiff had the lowest passing rate of products audited.

On November 21, 2021, Pecore told Plaintiff that she was being placed on suspension pending an investigation into another audit failure.

---

[4]Defendant asserts in its statement of disputed facts that due to quality concerns, Stoeger and Hameister told employees "that they would receive discipline for failing to follow BOM processes in July and August of 2021." ECF No. 33 at 3. In her statement of disputed facts, however, Plaintiff asserts that Stoeger and Hameister "did not communicate to associates in the tier meetings that were held in Value Stream 50, that there would be disciplinary action for missing ONE BOM ITEM." *Id.* at 2. She asserts that other employees did not receive the same information that was given to her—specifically, that one BOM failure would lead to disciplinary action from Stoeger or Hameister. Plaintiff's assertions are unsupported by any citation to evidence.

During this conversation, Plaintiff did not offer a reason for why there were issues with the products she built.

Stoeger discussed the matter with Pecore, and Stoeger recommended terminating Plaintiff based on Defendant's progressive discipline policy. On November 24, 2021, Defendant terminated Plaintiff's employment. Stoeger made this decision. Plaintiff was told that she was being terminated due to poor performance—specifically, that the most recent audit on her faucets revealed a missing label, a hot valve used instead of a cold valve, and a misaligned escutcheon. Missing a label and putting a hot valve where a cold valve should be were both considered BOM failures. Plaintiff received a termination letter in the mail shortly thereafter, wherein the reason for her termination was listed as "violation of work performance." The union did not file a grievance with respect to Plaintiff's termination.

### 2.7 Discipline of Other Employees

Plaintiff alleged that another employee, Cindy Johnston ("Johnston") received "a verbal conversation for performance failures but was not terminated." Plaintiff conceded, however, that she "d[id] not know where [] Johnston was on the disciplinary track." HR confirmed that Johnston received a verbal warning on September 9, 2021 for "high losses/poor quality or performance" after Johnston missed a label on a product. She received a verbal warning because she "had not received any discipline related to performance prior to this performance failure."

Plaintiff also alleged that an employee named "Jason McKinley" received a verbal warning for unspecified performance failures but was not terminated. Defendant has no records of an employee named Jason McKinley who worked in the Wisconsin Faucets division at the same time

as Plaintiff. Defendant did, however, have an employee named Jason Mickelson ("Mickelson") who worked as an ATOO at the same time as Plaintiff. Records reveal that Mickelson received a verbal warning in October 2021 for "high losses/poor quality or performance" because an item he assembled was missing a component. He received a verbal warning because he had not received any discipline related to performance prior to this performance failure.

HR confirmed that there were "no employees of any race in [Plaintiff's] department who had the same number of quality defects as [Plaintiff] had when she was terminated."[5] Every employee who had a performance failure uncovered by an audit was issued progressive discipline, as Plaintiff was.

### 2.8 EEOC Charge of Discrimination and Notice of Right to Sue

Plaintiff filed a Charge of Discrimination with the EEOC on November 8, 2021. The EEOC issued her a Notice of Right to Sue on November 10, 2021. Plaintiff was asked in her deposition whether there are "any other actions that you are alleging were discriminatory other than the stool and other than the termination," to which Plaintiff said "no."

### 3. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).

---

[5]Defendant's statement of disputed facts asserts that Plaintiff also had the "lowest efficiency rate of any associate in her department and high quality defects," ECF No. 33 at 3. Plaintiff disputes this, but her dispute is not supported by any evidence.

A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005).

Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994). But simply "denying a fact that has evidentiary support 'does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment.'" *Uncommon v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (internal quotation omitted).

4.  **ANALYSIS**

The gist of Plaintiff's claims is that she was allegedly treated worse by her employer and her superiors than her white coworkers were. ECF No. 10 at 4. Plaintiff does not appear to allege that she was subjected to a racially hostile work environment, but rather that she was disciplined disparately based on her race and retaliated against based on her complaints of the same.

### 4.1 Title VII – Racial Discrimination

To succeed on a Title VII racial discrimination claim, a plaintiff must produce evidence proving that "[1] [s]he is a member of a class protected by the statute, [2] . . . [s]he has been the subject of some form of adverse employment action (or that [s]he has been subjected to a hostile work environment), and [3] . . . the employer took this adverse action on account of the plaintiff's membership in the protected class." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citation omitted). "The legal standard used to evaluate a discrimination claim is simply whether the evidence, considered as a whole, would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Id.* (citation and internal quotation marks omitted). This standard is an alternative to the *McDonnell Douglas* burden-shifting framework, which provides that, after a plaintiff has met her initial burden of establishing a prima facie case of racial discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)).

Plaintiff, as an African-American individual, is indisputably a member of a protected class, and she was indisputably subjected to some form of adverse employment action by virtue of her termination and related discipline. But based on the record now before the Court, no reasonable juror could conclude that Defendant undertook these adverse employment actions because of Plaintiff's race.

"[S]ummary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus.*, 325 F.3d

892, 901 (7th Cir. 2003) (citation and internal quotation marks omitted). Plaintiff has utterly failed to "put up." *Id*. Her "own beliefs are not enough to defeat a motion for summary judgment." *Hereford v. Catholic Charities, Inc.*, No. 18-cv-1049-JDP, 2020 U.S. Dist. LEXIS 78711, at *17–18 (W.D. Wis. May 5, 2020). And "[a]lthough [Plaintiff] appears *pro se*, this does not excuse [her] from presenting admissible evidence to oppose [Defendant's] summary judgment motion." *Young v. Brew City*, No. 19-CV-464, 2021 U.S. Dist. LEXIS 28229, at *2 (E.D. Wis. Feb. 16, 2021).

Plaintiff has not proffered any evidence whatsoever to support the conclusion that her race caused her termination or any of the discipline leading up thereto.[6] Beyond submitting a statement of the facts she disputes, she has failed to oppose or respond in any form to the instant motion for summary judgment. Moreover, her proffered disputes of fact offer nothing of evidentiary value to rebut Defendant's showing that she regularly failed audits, regularly violated Defendant's attendance policy, had been progressively issued multiple verbal and written warnings, and had the highest number of quality defects out of all the employees in her department. In other words, the undisputed facts show that Defendant had a "legitimate, nondiscriminatory reason"—Plaintiff's performance problems—to terminate her. *McDonnell Douglas*, 411 U.S. at 802. *See also Gamble v. FCA US LLC*, 993 F.3d 534, 539 (7th Cir. 2021) (dismissing Title VII claim on summary judgment where plaintiff "failed to identify someone who was subject to the same performance standards and engaged in

---

[6] Additionally, the Court already concluded in its order on Defendant's motion to dismiss that any alleged removal of the stool from Plaintiff's station cannot support a Title VII racial discrimination claim. *See* ECF No. 24 at 13 ("Removal of a piece of equipment that facilitates an employee's performance but on which they do not strictly depend, and the use of which does not entitle them to a higher rate of pay, does not constitute an adverse employment action.").

misconduct of 'comparable seriousness'") (quoting *Silva v. Wisconsin*, 917 F.3d 546, 559 (7th Cir. 2019)).

"[E]ven a pro se plaintiff must cooperate in discovery and she must come forward with admissible evidence to meet a defendant's motion for summary judgment." *Byrd v. Wis. Dep't of Veterans Affs.*, 98 F. Supp. 3d 972, 976–77 (W.D. Wis. 2015). Plaintiff has not done so, and her own unsupported denials are insufficient to create a genuine dispute of material fact. *See Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) ("[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material."); *see also Young,* 2021 U.S. Dist. LEXIS 28229, at *12 ("[Plaintiff] put[] forth no evidence beyond his own suppositions that race played a role in his suspension and alleged termination. [Plaintiff's] bare assertions of covert racial animus are insufficient to raise a factual dispute."). Accordingly, the Court is constrained to grant Defendant's motion for summary judgment with respect to this claim.

### 4.2 Title VII – Retaliation

"In addition to direct discrimination, Title VII proscribes discriminating against an employee 'because he has opposed any practice made an unlawful employment practice by [Title VII].'" *Baird v. Iris USA, Inc.*, No. 18-cv-894-pp, 2020 U.S. Dist. LEXIS 177376, at *30 (E.D. Wis. Sept. 25, 2020) (quoting 42 U.S.C. § 2000e-3(a)). "To survive summary judgment on a Title VII retaliation claim, an employee must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [defendant] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Abrego*, 907 F.3d at 1014 (citation and internal quotation marks

Page 13 of 15
Case 2:22-cv-00065-JPS   Filed 05/31/23   Page 13 of 15   Document 42

omitted). For the same reasons discussed in the previous section, Plaintiff's retaliation claim must also be dismissed.

Plaintiff claims that she was retaliated against for her complaints of racial discrimination by the imposition of more frequent audits against her, but again, she fails to put forward any actual evidence in support of that allegation. Moreover, a review of the parties' statement of undisputed facts belies the allegation. Any additional audits to which Plaintiff was subject can be explained by the fact that once an audit discovers a nonconforming product, the system will continue to automatically audit all subsequent lots until there are no nonconforming products. Plaintiff indisputably produced numerous nonconforming products.

Plaintiff also alleges that the stool was removed from her station in retaliation for her complaints, but she again fails to support that contention with any evidence. The parties' joint statement of undisputed facts provides that the investigation into the stool's disappearance was unsuccessful, so it is not even clear whether her employer or her superiors had anything to do with the stool's alleged disappearance at all. And in any event, as noted previously, the Court has already held that removal of the stool from Plaintiff's work station does not constitute a materially adverse employment action for Title VII purposes as a matter of law. ECF No. 24 at 13; *see also Boss v. Castro,* 816 F.3d 910, 918–19 (7th Cir. 2020) (Title VII's anti-retaliation provision does not protect against "petty slights" and "minor annoyances").

Plaintiff has also not shown that she was terminated or otherwise disciplined in retaliation for any protected conduct. Plaintiff repeatedly violated Defendant's policies and procedures, apparently to a greater extent than everyone else in her department. She was consistently put on notice of

her shortcomings, but her performance does not appear to have improved in any meaningful sense, if at all. This, too, is fatal to her claims. *See Boss*, 816 F.3d at 919 ("[Plaintiff's] employers adduced evidence showing that he had failed to meet their legitimate expectations, thereby rebutting any presumption that their actions were taken in retaliation for [Plaintiff's] EEOC case."). Based on the record now before the Court, no reasonable juror could conclude that Plaintiff was retaliated against by Defendant based on any protected activity.

## 5. CONCLUSION

For the reasons stated herein, the Court will grant summary judgment for Defendant on Plaintiff's Title VII claims.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment, ECF No. 31, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's Title VII claims be and the same are hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of May, 2023.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge